UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SERGIO LOVATI, RUDI LOVATI,
ALESSANDRA SARAGO LOVATI AND
ALESSANDRO LUCIBELLO PIANI,

               Plaintiffs,

        v.

THE BOLIVARIAN REPUBLIC OF
VENEZUELA,

              Defendant.

Case No.: 1:19-CV-04793-ALC
Case No.: 1:19-CV-04796-ALC

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO VACATE CERTIFICATES OF DEFAULT
AND DISMISS FOR LACK OF PERSONAL JURISDICTION**

DUANE MORRIS LLP
1540 Broadway
New York, New York 10036
(212) 692-1000

*Attorneys for Plaintiffs*

*Table of Contents*

*Page*

Table of Authorities ........................................................................................................ ii

Preliminary Statement ....................................................................................................1

Factual and Procedural Background ................................................................................3

ARGUMENT ...................................................................................................................7

I       THE COURT SHOULD DENY THE MOTION BECAUSE
        PLAINTIFFS EFFECTED SERVICE ON THE REPUBLIC
        PURSUANT TO SECTION 1608 OF THE FSIA ............................................. 7

        A.      The FSIA Requires Enforcement of the Republic's Commitments ....................... 8

        B.      The Republic's "Strict Adherence" Argument Rings Hollow .............................. 12

        C.      The Enforcement of this "Special Arrangement"
                Comports with the FSIA ...................................................................... 16

II      THE COURT APPROPRIATELY EXERCISED ITS AUTHORITY
        TO REMEDY THE REPUBLIC'S BREACH OF THE SPECIAL
        ARRANGEMENT WHEN IT DIRECTED SERVICE UPON
        THE REPUBLIC'S EMBASSY IN NEW YORK ......................................... 18

        A.      The Republic's Specious Specific Performance Argument ................................. 18

        B.      Vienna Convention Inapplicable ............................................................. 21

III     THE COURT SHOULD NOT VACATE THE
        CERTIFICATES OF DEFAULT .................................................................. 23

CONCLUSION ............................................................................................................25

Table of Authorities

Cases                                                                Page(s)

*ACL1 Invs. Ltd. v. Bolivarian Republic of Venezuela,*
    No. 19-cv-9014 (LLS), D.E. 11 (S.D.N.Y. Oct. 21, 2019) ...................................................11

*Ben-Rafael v. Islamic Republic of Iran,*
    540 F. Supp. 2d 39 (D.D.C. 2008) ..................................................................................... 9-10

*Chevron Corp. v. Donziger,*
    833 F.3d 74 (2d Cir. 2016) ................................................................................................ 12-13

*Cho v. 401-403 57th St. Realty Corp.,*
    300 A.D.2d 174, 752 N.Y.S.2d 55 (1st Dep't 2002) ............................................................20

*Commercial Bank of Kuwait v. Rafidain Bank,*
    15 F.3d 238 (2d Cir. 1994) ...................................................................................................24

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
    932 F.3d 126 (3d Cir. 2019),
    *petition for cert. filed*, No. 19-1049 (U.S. Feb. 24, 2020) ......................................................20

*Da Silva v. Musso,*
    53 N.Y.2d 543, 444 N.Y.S.2d 50 (1981) ..............................................................................21

*Finamar Inv'rs Inc. v. Republic of Tadjikistan,*
    889 F. Supp. 114 (S.D.N.Y. 1995) ..................................................................................15, 17

*First City, Texas-Houston, N.A. v. Rafidain Bank,*
    281 F.3d 48 (2d Cir. 2002) ...................................................................................................15

*Gray v. Permanent Mission of the People's Republic of the Congo to the United Nations,*
    443 F. Supp. 816 (S.D.N.Y. 1978),
    *aff'd*, 580 F.2d 1044 (2d Cir. 1978) ......................................................................................16

*Hanna v. Plumer,*
    380 U.S. 460 (1965) ......................................................................................................11, 18

*Hellenic Lines, Ltd. v. Moore,*
    345 F.2d 978 (D.C. Cir. 1965) .............................................................................................23

*In re Letourneau,*
    559 F.2d 892 (2d Cir. 1977) .................................................................................................13

*Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo,*
    131 F. Supp. 2d 248 (D.D.C. 2001) ................................................................................14, 18

*Page(s)*

*ITT Cmty. Dev. Corp. v. Barton*,
    569 F.2d 1351 (5th Cir. 1978) ....................................................................12

*Lewis & Kennedy, Inc. v. Permanent Mission of the Republic of Botswana to the United Nations*,
    No. 05 Civ. 2591 (HB), 2005 WL 1621342 (S.D.N.Y. July 12, 2005) ...................14

*Marlowe v. Argentine Naval Comm'n*,
    604 F. Supp. 703 (D.D.C. 1985) ..................................................................15

*McFarland v. Gregory*,
    322 F.2d 737 (2d Cir. 1963)...................................................................14, 21

*Montclair Elecs., Inc. v. Electra/Midland Corp.*,
    326 F. Supp. 839 (S.D.N.Y. 1971)..............................................................11

*MyPlayCity, Inc. v. Conduit Ltd.*,
    No. 10 Civ. 1615 (CM), 2013 WL 150157 (S.D.N.Y. Jan. 11, 2013)...................19

*N.Y. Cmty. Bank v. Estate of Paraskevaides*,
    No. 18-cv-3987 (PKC), 2019 WL 3024703 (S.D.N.Y. July 11, 2019) ................19

*Napolitano v. Tishman Const. Corp.*,
    No. 96 CV 4402(SJ), 1998 WL 102789 (E.D.N.Y. Feb. 26, 1998)......................22

*New England Merchants Nat'l Bank v. Iran Power Generation & Transmission Co.*,
    495 F. Supp. 73 (S.D.N.Y. 1980)................................................................13

*NML Capital, Ltd. v. Republic of Argentina*,
    699 F.3d 246 (2d Cir. 2012)....................................................................9, 21

*OI European Group B.V. v. Bolivarian Republic of Venezuela*,
    No. 16-cv-1533, D.E. 101 (D.D.C. Nov. 1, 2019)...........................................8

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ...................................................................14

*Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*,
    760 F.2d 390 (2d Cir. 1985).........................................................................9

*Republic of Sudan v. Harrison*,
    139 S. Ct. 1048 (2019) ..................................................................... *passim*

*S.E.C. v. McNulty*,
    137 F.3d 732 (2d Cir. 1998).......................................................................24

*Sokoloff v. Harriman Estates Dev. Corp.*,
    96 N.Y.2d 409, 729 N.Y.S.2d 425 (2001) ....................................................20

*Page(s)*

*Stellar Sutton LLC v. Dushey*,
    82 A.D.3d 485, 918 N.Y.S.2d 418 (1st Dep't 2011) ............................................................20

*Tachiona v. U.S.*,
    386 F.3d 205 (2d Cir. 2004) ................................................................................................16

*U.S. v. DiPaolo*,
    466 F. Supp. 2d 476 (S.D.N.Y. 2006) ..................................................................................24

*U.S. v. Erdoss*,
    440 F.2d 1221 (2d Cir. 1971) ..............................................................................................24


*Statutes and Other Authorities*

28 U.S.C. § 1605(a)(1) .................................................................................................................9

28 U.S.C. § 1608(a)(1) ......................................................................................................*passim*

28 U.S.C. § 1608(a)(2) ...............................................................................................................10

28 U.S.C. § 1608(a)(3) ..........................................................................................10, 15, 17, 22

28 U.S.C. § 1608(a)(4) .................................................................................................10, 15, 17

28 U.S.C. § 1608(b) ...................................................................................................................15

28 U.S.C. § 1608(b)(1) ........................................................................................................15, 17

28 U.S.C. § 1608(b)(3) ...............................................................................................................17

FRCP 4 .................................................................................................................................11, 22

H.R. Rep. No. 94-1487 (1976) ..............................................................................................10, 17

S. Rep. No. 94-1310 (1976) ..........................................................................................................8

Restatement (Second) of Contracts § 360 cmt. d ......................................................................21

Plaintiffs Sergio Lovati, Rudi Lovati, Alessandra Lovati and Alessandro Lucibello Piani (collectively, "Plaintiffs"), by and through their undersigned counsel, Duane Morris LLP, hereby submit the following response to the Motion to Vacate Certificates of Default and Dismiss for Lack of Personal Jurisdiction ("Motion") filed by Defendant, the Bolivarian Republic of Venezuela (the "Republic"), on March 13, 2020.

The Court should deny the Motion.  As discussed below, the Court's June 11, 2019 Order authorizing Plaintiffs to serve their Complaints on the Republic's Embassy (the "Order") was a proper exercise of judicial authority consistent with the Republic's contractual commitments to Plaintiffs and consistent with the letter and spirit of the Foreign Sovereign Immunities Act (the "FSIA").  The Republic has failed to show that this Court abused its discretion in granting the Order.  Service of process on the Republic pursuant to the Order put the Republic on notice of the claims against it and conferred jurisdiction over it, so there is no reason to dismiss the Complaints.  Furthermore, the Court should not vacate the August 20, 2019 Certificates of Default unless and until the Republic makes good on its commitment to accept service of the Complaints and respond as required by the FSIA (and as Plaintiffs have proposed on several occasions).

## Preliminary Statement

To decide the Motion, the Court needs to answer but a single question:

Does the Court have authority to enforce a "special arrangement" in a contract whereby a foreign sovereign: (a) irrevocably submits to the Court's jurisdiction; (b) commits to the application of United States law; (c) irrevocably waives sovereign immunity; (d) agrees to a method of service of process within the United States; and (e) agrees to maintain at all times an agent within the United States to acknowledge service of process?

The answer to that question is "Yes." This Court has the authority to enforce the parties' agreed-upon "special arrangement" for service of process consistent with the FSIA, and the Order was a proper exercise of the Court's broad discretionary authority.  Nothing in the Republic's Memorandum of Law ("MOL") supports a contrary conclusion.

Any other answer would effectively render the FSIA a dead letter.  The Republic has been able to borrow billions of dollars from bondholders by promising to answer for its debts in New York.  Permitting foreign sovereigns to disregard irrevocable commitments without consequence would leave commercial transactions with sovereigns on a far more perilous footing than they are today.  A sovereign's waiver of immunity and its submission to United States jurisdiction and law mean little if a United States court may not enforce the "special arrangement" for process that is inextricably tied to the sovereign's other commitments.

As a condition to accepting millions of dollars from the Plaintiffs, among others, the Republic irrevocably submitted to the jurisdiction of this Court to enforce and interpret the parties' contract under New York law.  The Republic also committed to accept service of process in accordance with the FSIA's strong preference for a "special arrangement."  28 U.S.C. § 1608(a)(1).  In particular, the Republic agreed that service could be made on the Republic's Consul in New York, or on any member of the Consulate in his absence.  The Republic further committed to maintain *at all times* an agent appointed in New York for the service of process.

The Republic indisputably has not complied with the "special arrangement:" the Consul was recalled, the Consulate closed, and the Republic has not appointed an agent for service of process.  The Republic has refused to do so even when reminded of its commitment.[1]  The

---

[1] The Republic asserts its new regime has committed to "come to terms with all the Republic's creditors."  (MOL at 6.)  There is no reason the new regime could not appoint an

Republic concedes this Court has the authority to interpret the scope of the "special arrangement" under the FSIA. But the Court's authority to interpret the "special arrangement" is coextensive with its broad discretionary authority to enforce the Republic's commitments thereunder. The Court therefore can provide – and indeed its Order did provide – Plaintiffs a remedy for the Republic's breaches that is fully consistent with the FSIA.

As shown below, nothing in the FSIA or in any of the cases cited in the MOL detracts from the inescapable conclusion that a court – with undisputed jurisdiction to enforce a contract – can enforce a "special arrangement" under which a sovereign irrevocably waived its sovereign immunity. A central purpose of the FSIA is to encourage "special arrangements" that facilitate global commerce while eschewing sensitive matters of international diplomacy. The Republic's position in its MOL is directly antithetical to this purpose, contrary to its contractual commitments, and inconsistent with the authority of the Court to whose jurisdiction it has irrevocably submitted. The Court should deny the Republic's Motion to Dismiss.[2]

## **Factual and Procedural Background**

Plaintiffs are the owners of certain bonds issued by the Republic. At issue in these two cases are bonds referred to as the "2023 bonds" and the "2027 bonds."[3] The Republic issued the

---

agent for service of process, and the MOL offers no justification for the Republic's continued failure to do so.

[2] Plaintiffs will be prejudiced if the Court vacates the Republic's willful default. They recognize, however, that Courts favor the resolution of disputes on the merits, and thus have offered to vacate the Certificates of Default if the Republic agrees to abide by the "special arrangement" and litigate on the merits. If the Republic believes it has payment defenses that the Court is authorized to decide, it should also recognize the Court's authority to enforce all facets of the parties' agreement, including the "special arrangement" for service of process. Plaintiffs accordingly request that the Court only grant the Motion to Vacate if it limits further prejudice to Plaintiffs by also denying the Motion to Dismiss and compelling an Answer to the Complaint.

[3] The 2023 bonds are at issue in Case No. 19-cv-04793-ALC, and the 2027 bonds are at issue in Case No. 19-cv-04796-ALC. With minor exceptions noted below, the relevant

2023 bonds pursuant to a Fiscal Agency Agreement, dated July 25, 2001 (the "2023 FAA"), and

the 2027 bonds pursuant to a Fiscal Agency Agreement, dated September 3, 1997 (the "2027

FAA").  The Republic committed to make bi-annual interest payments on the bonds until their

maturity dates – May 7, 2023 for the 2023 bonds and September 15, 2027 for the 2027 bonds.  In

late 2017, however, the Republic stopped making interest payments and currently owes Plaintiffs

tens of millions of dollars as a result of its defaults.  (*See generally* D.E. 1.)

Plaintiffs accordingly commenced these breach of contract lawsuits on May 23, 2019 to

enforce the Republic's breached obligations.[4]  Plaintiffs filed the lawsuits in the Southern

District of New York consistent with the 2023 and 2027 FAA's terms.  In issuing the bonds, the

Republic irrevocably submitted to the jurisdiction of this Court, and irrevocably waived any

claims to sovereign immunity with respect to any judgment obtained therefrom:

> ***[The Republic] agree[s] that any suit, action or proceeding against it or its
> properties, assets or revenues with respect to this [the bonds] (a "Related
> Proceeding") shall be brought exclusively in the Supreme Court of the State of
> New York, County of New York; in the United States District Court for the
> Southern District of New York;*** . . . (all such courts described in this sentence
> being called herein "Specified Courts"). . . . ***[The Republic] hereby irrevocably
> submits to the exclusive jurisdiction of each of the Specified Courts for the
> purpose of any Related Proceeding and, solely for the purpose of enforcing or
> executing any judgment referred to in the preceding sentence (a "Related
> Judgment"), of each Specified Court and each Other Court.*** . . .
>
> …
>
> To the extent that [the Republic] or any of its revenues, assets or properties shall
> be entitled, with respect to any Related Proceeding at any time brought against
> [the Republic] or any of its revenues, assets or properties in any jurisdiction in

---

contractual commitments, pleadings, and filings in each case are identical.  Docket entries
referenced herein as "D.E. __" apply to both cases unless otherwise noted by inclusion of the
corresponding case index number.

[4] While the Republic questions the Plaintiffs' motives for enforcing commitments to pay
millions of dollars, it conversely recognizes that other creditors already have judgments against
the Republic and arguably are in a better position to recover than Plaintiffs are.  (MOL at 6.)

which any Specified Court is located . . . to any immunity from suit, from the jurisdiction of any such court, from attachment prior to judgment, from attachment in aid of execution of judgment, from execution of a judgment or from any other legal or judicial process or remedy, and to the extent that in any such jurisdiction there shall be attributed such an immunity, ***[the Republic] irrevocably agree[s] not to claim and irrevocably waive[s] such immunity to the fullest extent permitted by the laws of such jurisdiction (including, without limitation, the Foreign Sovereign Immunities Act of 1976 of the United States***) . . . .

(D.E. 26-2 in 19-cv-04793 at 28-29; D.E. 35-3 in 19-cv-04796 at 82-83 (emphasis added).)

The Republic also agreed to appoint and maintain an agent for service of process for

these lawsuits and, indeed, for any claims arising out of the bonds it issued to Plaintiffs:

> ***[The Republic] agree[s] that service of all writs, process and summonses in any Related Proceeding or any Suit, action or proceeding to enforce or execute any Related Judgment brought against it in the State of New York may be made upon the Consul General of the Republic of Venezuela or, in his or her absence or incapacity, any official of the Consulate of Venezuela, presently located at 7 East 51st Street, New York, New York 10022, U.S.A. (the "New York Process Agent"),*** and service of all writs, process and summonses in any Related Proceeding or any suit, action or proceeding to enforce or execute any Related Judgment brought against it in England may be made upon the person in charge of consular affairs at the Embassy of the Republic of Venezuela, presently located at One Cromwell Road, London SW7 2HW, England (the "London Process Agent" and, together with the New York Process Agent, the "Process Agents"), and [the Republic] irrevocably appoint[s] each Process Agent as its agent to receive such service of any and all such writs, process and summonses, and [agrees] that the failure of any of the Process Agents to give any notice to it of any such service of process shall not impair or affect the validity of such service or of any judgment based thereon. ***[The Republic] agree[s] to maintain at all times an agent with offices in New York to act as its New York Process Agent, and an agent with offices in London to act as its London Process Agent as aforesaid (each such agent to be appointed by an irrevocable power of attorney hereto granted before a Venezuelan notary public).*** Nothing herein shall in any way be deemed to limit the ability to serve any such writs, process or summonses in any other manner permitted by applicable law.

(D.E. 26-2 in 19-cv-04793 at 28-29; D.E. 35-3 in 19-cv-04796 at 83 (emphasis added).)

The Republic further agreed that its commitments to Plaintiffs would "be governed by

and interpreted in accordance with the laws of the State of New York without regard to any"

conflicts of laws principles, "except that all matters governing the authorization and execution"

5

would be governed by the laws of Venezuela.  (D.E. 26-2 in 19-cv-04793 at 26; D.E. 35-3 in 19-cv-04796 at 85.)

Consistent with the Republic's irrevocable commitments, Plaintiffs attempted to serve the Complaints at the Republic's Consulate in New York.  But despite the Republic's promise to "maintain at all times an agent with offices in New York to act as its New York Process Agent," Plaintiffs discovered that the Consul General had been recalled, the Consulate had been closed, and the Republic failed to appoint an alternative agent for service of process.

Plaintiffs therefore sought relief from this Court for the Republic's breach, requesting an order authorizing alternative service on the Republic's Embassy to the United Nations in New York.  (D.E. 7.)  The Court granted that request on June 11, 2019 by issuing the Order, which Order is the object of the Republic's challenge.  (D.E. 8.)  Pursuant to the Order, Plaintiffs served the Republic's Embassy on June 12.[5]  (D.E. 11.)  Plaintiffs also delivered copies to the Republic's current counsel.[6]  (D.E. 26 ¶ 9 in 19-cv-04793; D.E. 35 ¶ 9 in 19-cv-04796.)  The Republic has been in receipt of the Complaints for almost a year but has refused to answer.

Instead, on July 31, 2019, the Republic announced that it would not comply with the Order and asked the Court to vacate it, asserting effectively the same arguments in support of the relief it seeks in this Motion.  (D.E. 9.)  The Court did not vacate the Order, however.  (D.E. 17 in 19-cv-04796.)  The Clerk entered Certificates of Default on August 20, 2019 (D.E. 15 in 19-cv-04793; D.E. 16 in 19-cv-04796), and, eight days later, the Republic filed a second letter with

---

[5] In the alternative, the Order also authorized service on the Republic's Embassy to the United States in Washington D.C.  (D.E. 8.)  Plaintiffs attempted such alternative service, but their process server reported that it was unable to effect service, having been informed that the Embassy had been vacated after it was overtaken by protesters.

[6] The Republic is a party to similar bond-default lawsuits in this Court, represented by the same counsel as in this matter, so the allegations in the Complaints should come as no surprise. (*E.g.*, D.E. 9.)  Indeed, its MOL contains no such averment.

the Court requesting a pre-motion conference to vacate the Certificates of Default.  (D.E. 17 in

19-cv-04793; D.E. 18 in 19-cv-04796.)  Showing full awareness of the claims against it, the

Republic asserted in that August 28 letter that it has valid defenses to the Complaints.  (*Id.*)

Meanwhile, Plaintiffs offered to agree to vacate the defaults if the Republic would abide

by its contractual commitment to accept service in New York.  (*See, e.g.*, D.E. 26 in 19-cv-04793

¶ 14.)  The Republic declined, opting instead for protracted litigation over its undisputed refusal

to maintain an agent for service of process in New York.  Therefore, on December 9, 2019,

Plaintiffs moved for the entry of Default Judgments against the Republic.  (D.E. 25 in 19-cv-

04793; D.E. 26 in 19-cv-04796).  On December 11, Plaintiffs asked the Court to consider said

motion in conjunction with the Republic's proposed motion to vacate certificates of default.

(D.E. 33 in 19-cv-04793; D.E. 36 in 19-cv-04796).  The Court held a pre-motion conference on

February 11, 2020, whereupon it established a briefing schedule for the current Motion.

The Court should deny the Motion for the reasons stated below.

## **ARGUMENT**

## **I**

### **THE COURT SHOULD DENY THE MOTION BECAUSE PLAINTIFFS EFFECTED SERVICE ON THE REPUBLIC PURSUANT TO SECTION 1608 OF THE FSIA**

Much of the Republic's MOL are irrelevant to the central question before the Court: does

the FSIA – which establishes, authorizes and even encourage "special arrangements" as a

preferred method for service of process on a sovereign – bar this Court from enforcing a "special

arrangement" in a contract that irrevocably submits the parties to the Court's exclusive

jurisdiction?  As heart rending as the crisis might be, the MOL's five-page overview of a

humanitarian emergency is irrelevant to the interpretation of the FSIA or the Court's authority to

enforce a "special arrangement."[7]  The Republic does not assert otherwise.  Nor does the

Republic dispute that it is bound by – and has breached – a "special arrangement" entered into

pursuant to the FSIA.  (*See* MOL at 13 (conceding contractual service-of-process provision

"constituted a special arrangement")).  Instead, the Republic invokes a restrictive view of the

FSIA to argue that the Court has no choice but to reward the Republic's refusal to honor its legal

obligation to abide by that arrangement, thereby effectively nullifying similar arrangements

underlying billions of dollars of the Republic's debt obligations.  The Court should reject the

Republic's preposterous position and require it to answer the Complaint.

### A.      The FSIA Requires Enforcement of the Republic's Commitments

The Republic invokes the FSIA to justify its refusal to appear in this lawsuit.  But its

interpretation of the FSIA is not merely unwarranted; it also undermines the purposes of the

FSIA and diminishes the authority of this Court.  Congress enacted the FSIA – and placed

primacy on the FSIA's "special arrangements" provision – in order to "encourage potential

plaintiffs and foreign states to agree to a procedure on service."  S. Rep. No. 94-1310 at 13

(1976).  Allowing sovereigns to ignore such commitments would be detrimental to the interests

of the counterparties who transact in reliance on the sovereign's commitment to answer for any

defaults in the courts of the United States.  Just as the Court can enforce promises to pay, it can

enforce promises to be sued in New York, waivers of immunity, and promises to maintain an

agent for service of process.  To hold otherwise would be tantamount to abrogating the

Republic's express and irrevocable waiver of sovereign immunity and submission to United

---

[7] To the extent that humanitarian concerns are relevant to this litigation, the Republic's proper course is to answer the Complaint and move for a stay of proceedings.  Indeed, the Republic's affiliated entities have sought to do just that in the past, to little avail.  *See, e.g.*, *OI European Group B.V. v. Bolivarian Republic of Venezuela*, No. 16-cv-1533, D.E. 101 at 5 (D.D.C. Nov. 1, 2019) (denying stay, reasoning "the political uncertainty in Venezuela is also a circumstance that bolsters plaintiff's argument that it should be allowed to seek attachment").

States jurisdiction.[8]  Sustaining the Republic's position would effectively repeal the "special arrangements" provision of the FSIA, since it would allow sovereigns to void such arrangements.

The FSIA provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1).  There is no dispute that the Republic explicitly and irrevocably waived any claim to sovereign immunity with respect to claims arising out of or related to the bonds. (D.E. 26-2 in 19-cv-04793 at 28-29; D.E. 35-3 in 19-cv-04796 at 83.)  Nor is there any dispute that the Republic explicitly consented to the jurisdiction of this Court regarding any claims arising out of the bonds and agreed that all such claims would be governed under New York law. (*Id.*)  Therefore, this Court has jurisdiction over the Republic.  The Court can enforce the bonds, precisely as the parties agreed, and the Republic does not contend otherwise.  (*See* MOL at 20.)

To be sure, service on the Republic must be effected before the Court can rule on the merits.  Section 1608(a) of the FSIA prescribes four methods for service of process on foreign sovereigns "in descending order of preference," with a "special arrangement" under Section 1608(a)(1) being the "preferred method of service."  *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008); *see also Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1054

---

[8] Indeed, where a waiver of sovereign immunity comports with the FSIA, federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them."  *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*, 760 F.2d 390, 394 (2d Cir. 1985) (internal quotation marks omitted); *cf. NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 263 (2d Cir. 2012) ("Argentina voluntarily waived its immunity from the jurisdiction of the district court, and the FSIA imposes no limits on the equitable powers of a district court that has obtained jurisdiction over a foreign sovereign.").

(2019) (discussing "hierarchical order" of four methods of FSIA service).[9]  The purpose of the preferred "special arrangement" provision in Section 1608(a)(1) was to avoid sensitive diplomatic implications by encouraging sovereign commitment to a "procedure on service." H.R. Rep. No. 94-1487 (1976).  Congress thus intended that, "[i]f such an arrangement exists, service must be made under this method."  *Id.*  The other provisions of the FSIA come into play only "[i]f no special arrangement exists."  *Id.*; *see also Ben-Rafael*, 540 F. Supp. 2d at 52 ("Plaintiffs must attempt service by the first method" before proceeding to other methods.").[10]

The Republic concedes that the 2023 and 2027 FAA contain a "special arrangement." (MOL at 13.)  In particular, the Republic agreed that service of all process may be made upon the Consul General of the Republic of Venezuela or, in his or her absence or incapacity, any official of the Consulate of Venezuela.  (D.E. 26-2 in 19-cv-04793 at 28-29; D.E. 35-3 in 19-cv-04796 at 83.)  The Republic also agreed to maintain *at all times* an agent with offices in New York to act as its New York Process Agent.  (*Id.*)  Yet one can read the Republic's entire brief and scarcely come upon a mention of its obligation to appoint such an agent, let alone its refusal to do so on several occasions, even in the presence of the Court.  No attempt is made to explain why the Republic adamantly refuses to honor its contractual commitment.

---

[9] Section 1608(a)(2) applies where the sovereign is party to an international convention but not to a special arrangement.  Sections 1608(a)(3) and (a)(4) apply where there is no arrangement or convention.  Because the latter methods do not rest on a sovereign's consent and employ "diplomatic channels to the foreign state," they logically require more sensitivity to diplomatic concerns.  28 U.S.C. § 1608(a)(4).

[10] The Republic is therefore wrong to blithely assert that Plaintiffs should resort to the diplomatically-fraught back-channel service method set forth in Section 1608(a)(4) amidst its government's turmoil.  (MOL at 17-18.)  That method is meant as a "method of last resort" to be turned to in the absence of a special arrangement.  H.R. Rep. No. 94-1487 at 24.  Here, there is an enforceable arrangement.

Nevertheless, the Republic does not dispute that it is in breach.  Therefore the Court –

with irrevocable jurisdiction over the dispute – fashioned a remedy for the Republic's breach

through the Order, which directed service in a method reasonably calculated to provide the

Republic with notice, *i.e.*, by authorizing service on the Republic's Embassy.  (D.E. 8.)  The

Republic has previously asked the Court to vacate that discretionary Order – invoking the same

Supreme Court authority cited in its MOL – but the Court declined to do so.  (D.E. 17 in 19-cv-

04796.)  Judge Stanton of this Court likewise has exercised his discretion to remedy the

Republic's breach of a similar special arrangement; that order still stands.  *See ACL1 Invs. Ltd. v.*

*Bolivarian Republic of Venezuela*, No. 19-cv-9014 (LLS), D.E. 11 (S.D.N.Y. Oct. 21, 2019).

Plaintiffs acted in accordance with the Order and there is no question that the Republic is aware

of the lawsuit, as is evidenced by its multiple filings in this Court, including its MOL here.[11]

The sole question for the Court, then, is whether a sovereign that has irrevocably

submitted to the jurisdiction of this Court to interpret and apply its contract, and that has

committed to a "special arrangement" for service of process in that contract, can also be

compelled to comply with that "special arrangement" under the FSIA.  The only logical or fair

answer to that question is in the affirmative.  The FSIA envisions mutual compliance with the

statute.  In these circumstances, the only solution is for the Court to effect a remedy of the

breach, which is precisely what the Order did.  The Court has the authority and the discretion to

compel compliance with that breached arrangement by fashioning a remedy that provides for an

---

[11] The Republic does not dispute that the Order satisfied the "primary purpose of the
federal process rule," *i.e.*, "to provide the defendant with notice that an action has been filed
against it."  *Montclair Elecs., Inc. v. Electra/Midland Corp.*, 326 F. Supp. 839, 842 (S.D.N.Y.
1971); *see also Hanna v. Plumer*, 380 U.S. 460, 462 n.1 (1965) ("Actual notice is" goal of Rule
4).  Indeed, because service under the Order complies with Section 1608(a) as discussed herein,
it necessarily complies with FRCP 4(j)(1).

equivalent method of service of process as long as the method is reasonably calculated to provide the Republic with notice of the Complaint.

### B.      The Republic's "Strict Adherence" Argument Rings Hollow

To support its one-sided theory whereby the Republic can ignore its legal obligation while others are bound by theirs, the Republic brazenly argues that "Plaintiffs did not comply with Section 1608(a)(1)" because they could not serve the Consul General or a replacement agent as required by the "special arrangement."  (MOL at 13.)  But the sole reason the Plaintiffs were unable to serve the Consul General or a replacement agent is that the Republic's breach of the arrangement made such service impossible.  The Republic cannot, on the one hand, render strict adherence impossible by breaching its obligations and then, in the same breath, insist upon its counterparty's strict adherence with the arrangement it has breached.  The Republic's failure to maintain an agent for service of process does not preclude the Plaintiffs' ability to comply with Section 1608(a)(1).  The Court exercised its authority to effect a remedy of the Republic's breach by issuing the Order that, in effect, designated an agent for the Republic by authorizing service on the Embassy.  The Order thereby enabled Plaintiffs to comply with Section 1608(a)(1) and effect service by the remedied special arrangement.

Federal courts possess "various common law equity devices to be used incidental to the authority conferred on the court by rule or statute."  *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978); *see also Chevron Corp. v. Donziger*, 833 F.3d 74, 137 (2d Cir. 2016) ("As long ago recognized, there is inherent in the Courts of Equity a jurisdiction to give effect to the policy of the legislature.") (internal quotations and citations omitted).  The question is not – as the Republic would have it – whether the FSIA authorizes the Court to fashion a remedy for the Republic's breach.  (MOL at 11.)  The question, rather, is whether the FSIA – having established a contractual basis for statutory jurisdiction – curbs the Court's inherent authority to

interpret and enforce the respective parties' contractual obligations established by that statute.
*See, e.g.*, *Donziger*, 833 F.3d at 138 ("[U]nless a statute expressly, or by a necessary and
inescapable inference, restricts the court's jurisdiction in equity, we will infer that all the inherent
equitable powers of the District Court are available for the proper and complete exercise of that
jurisdiction.") (internal quotations and citations omitted).  It does not.

This Court previously recognized its authority to order alternative service under the FSIA
in similar circumstances after the Iranian Revolution.  *See New England Merchants Nat'l Bank v.
Iran Power Generation & Transmission Co.*, 495 F. Supp. 73 (S.D.N.Y. 1980).  The Court
concluded that "Congress did not seek to cover the problem of effecting service upon a foreign
government should diplomatic channels be closed."  *Id.* at 79.  Therefore, the Court exercised its
authority to order alternative service, reasoning it is "the function of a judge to reconcile specific
legislation to the particular facts of a case which Congress failed to specifically contemplate in
enacting the legislation."  *Id.*; *see also In re Letourneau*, 559 F.2d 892, 894 (2d Cir. 1977)
("When a congressional intent is unclear, . . . no diminution in the remedial powers of the federal
courts may be inferred. Congress must speak clearly to interfere with the historic equitable
powers of the courts it has created.").  The Order represents an appropriate exercise of the
Court's authority consistent with the foregoing precedent.

Despite the foregoing, the Republic seeks to constrain the Court's enforcement authority
by asserting that the Order's alternative service is not permissible under Section 1608(a) because
the Order did not strictly adhere to the "special arrangement" that the Republic ignored.  Nothing
in the text of the FSIA purports to deprive the Court of this authority, and the Republic cites no
case law limiting a Court's authority to remedy the Republic's breach.  Instead, the Republic
merely argues that case law requires "strict adherence" with the FSIA rather than the "substantial

compliance" brought about by the alternative service as ordered by the Court.  But when a Court exercises its broad equitable authority to enforce a breached contract, "the performance that it requires need not be identical with that promised in the contract."  *McFarland v. Gregory*, 322 F.2d 737, 739 (2d Cir. 1963).  Nowhere in its MOL does the Republic articulate why a Court – with undisputed jurisdiction to interpret and enforce a contract – may not enforce all of the contract's provisions.  The Court should reject the Republic's "strict adherence" argument.

The Republic's "strict adherence" argument also overstates the FSIA case law.  There is no case in the MOL holding that service under Section 1608(a)(1) must strictly adhere to a "special arrangement."  It is not even settled that "strict adherence" is required for service under any provisions of Section 1608.  *See, e.g.*, *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1129-30 (9th Cir. 2010) ("[A] plaintiff's failure to properly serve a foreign state defendant will not result in dismissal if the plaintiff substantially complied with the FSIA's notice requirements and the defendant had actual notice.").  Certainly none of the dozen or so Southern District cases cited by the Republic for its "strict adherence" argument involved a "special arrangement," let alone an arrangement that, like here, included an irrevocable waiver of sovereign immunity and a commitment to appoint an agent to accept service of process.[12]  (MOL at 12-13.)  By contrast, the Republic ignores cases applying a "substantial compliance" standard to special arrangements like the one at issue here.  *See, e.g.*, *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 251-52 (D.D.C. 2001) (alternative service allowed under special arrangement where strict adherence "would have been senseless" and thus "not mandatory" so

---

[12] Interestingly, one of the Republic's cases distinguished case law applying a "substantial compliance" standard because, like here, it involved a "special arrangement between the parties," where "actual notice of the lawsuit was received."  *Lewis & Kennedy, Inc. v. Permanent Mission of the Republic of Botswana to the United Nations*, No. 05 Civ. 2591 (HB), 2005 WL 1621342, at *3 n.4 (S.D.N.Y. July 12, 2005).

long as defendant receives notice); *Marlowe v. Argentine Naval Comm'n*, 604 F. Supp. 703, 708
(D.D.C. 1985) ("Because plaintiff substantially complied with this arrangement for service, such
service was proper upon ANC, a 'foreign state', under the FSIA, 28 U.S.C. § 1608(a)(1).").

The Republic also does not cite a single Second Circuit case in support of its "strict
adherence" argument.  In fact, it ignores Second Circuit case law holding that substantial
compliance with a "special arrangement" will satisfy the requirements of Section 1608(b)(1) –
which governs service on agencies and instrumentalities of a foreign sovereign – when the
sovereign entity and its counsel receive actual notice, as was accomplished here.  *First City,*
*Texas-Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 55 (2d Cir. 2002).  That binding precedent
should govern any special arrangement, regardless of the identity of the counterparty.  As one of
the Republic's principal cases explains, courts follow a "substantial compliance" standard under
Section 1608(b) because of a presumption that "agencies and instrumentalities often possess a
sophisticated knowledge of the United States legal system."  *Finamar Inv'rs Inc. v. Republic of*
*Tadjikistan*, 889 F. Supp. 114, 117-18 (S.D.N.Y. 1995).  This same presumption surely applies to
a sovereign that irrevocably commits to the jurisdiction of the United States legal system as a
condition to borrowing millions – and indeed, billions – of dollars from Plaintiffs and others.
Were the Court to adopt the Republic's conclusions here, sovereign commitments would
effectively be meaningless.

The Republic's elision of "special arrangements" under Section 1608(a)(1) with service
through diplomatic back-channels under Sections 1608(a)(3) and 1608(a)(4) ignores the
fundamental differences between the "preferred method" and the "last resort" provisions of the
statute.  Contrary to the MOL's selective quotation to *Sudan v. Harrison* (MOL at 11), the
*Harrison* Court justified inequitable "adherence to strict requirements" under Section 1608(a)(3)

because of the "sensitive diplomatic implications" of service under that provision.  *Harrison*, 139 S. Ct. at 1062.  It is important to note that the *Harrison* Court was not addressing the extraordinary and unexpected decision by a sovereign to ignore the "special arrangement" that permitted Section 1608(a)(1) service.  In fact, remedying the breach of an irrevocable waiver of sovereign immunity and appointment of agent for service of process simply does not present diplomatic concerns.[13]  Even the litany of cases cited in the Republic's MOL – including its so-called "leading case" (MOL at 13) – recognize the fundamental differences in the various subsections of Section 1608(a).  *See, e.g.*, *Gray v. Permanent Mission of the People's Republic of the Congo to the United Nations*, 443 F. Supp. 816, 820-21 (S.D.N.Y. 1978) ("Every mode of service prescribed by the statute assumes **either prior agreement** between a foreign state and the American authorities 28 U.S.C. § 1608(a)(1)-(2) **or mandates strict attention to the linguistic and diplomatic problems** inherent in such situations.") (emphasis added), *aff'd*, 580 F.2d 1044 (2d Cir. 1978); *cf. Tachiona v. U.S.*, 386 F.3d 205, 222 (2d Cir. 2004) ("**absent special agreement**, the FSIA does not permit personal service on agents or officers of the foreign state itself") (emphasis added).  In short, the Republic's "strict adherence" argument does not undercut the Court's authority and discretion to enforce a "special arrangement."

### C.       The Enforcement of this "Special Arrangement" Comports with the FSIA

The Republic's comparison of Sections 1608(a) – which applies to foreign states -- to 1608(b) – which applies to agents or instrumentalities of foreign states – likewise misses the point.  Both provisions list a "special arrangement" as the primary and preferred method of

---

[13] The *Harrison* case arose from allegations that the Republic of Sudan was liable for materially supporting terrorist activity.  Unlike here, the Republic of Sudan had not entered into any special arrangement to accept service in the United States.  In terms of "sensitive diplomatic implications," there is a substantial difference in degree and kind between employing an embassy to demand a sovereign defend against terrorism charges and merely enforcing a sovereign's contractual commitment to open its mission to service of process.

service.  *See* 28 U.S.C. §§ 1608(a)(1), (b)(1).  The Republic's argument ignores the similarities

concerning the relevant statutory provision and focuses on differences in irrelevant provisions.

As the Republic notes, Section 1608(b)(3) specifically permits judicial orders "as directed by the

Court" where service cannot be made under a "special arrangement," but the subparts to Section

1608(a) do not.  This difference simply has nothing to do with the preferred statutory method of

"special arrangements."  Section 1608(b)(3) merely reflects Congress' recognition that the

sensitive diplomatic channels applied to a foreign state under Sections 1608(a)(3) & (a)(4) can be

relaxed when dealing with instrumentalities that are presumed to "possess a sophisticated

knowledge of the United States legal system."  *Finamar*, 889 F. Supp. at 117-18.  These

concerns become a factor only "[i]f no special arrangement exists."  H.R. Rep. No. 94-1487 at

24.  These irrelevant provisions do not address the key question of a court's discretion to

determine where service *can* be made under a "special arrangement" in the event the sovereign

fails to honor its contractual obligation to appoint an agent.

Courts undoubtedly have authority to determine whether there is a special arrangement—

indeed, the Republic's MOL cites several cases where courts have concluded there was no

special arrangement to permit service of process under Section 1608(a)(1).  (MOL at 13-14.)  In

those cases, the plaintiffs accordingly were required to resort to alternative methods of service of

process consistent with the priorities of service under Section 1608(a).  What the Republic has

not explained, however, is why a court with undisputed authority to interpret and apply "special

arrangements" should be powerless to address and resolve a breach of such an arrangement.  The

Republic agreed to grant the Court this authority by contracting that the Court could consider

"any suit, action or proceeding against it or its properties, assets or revenues with respect to" the

Republic's contractual commitments to the Plaintiffs.  (*E.g.*, D.E. 26-2 in 19-cv-04793 at 28-29.)

That is, the parties agreed that this Court has the authority to address and remedy any breach of the parties' contract.  The Order does precisely that.

Contrary to the Republic's assertion, the Court's authority to do so is entirely consistent with the FSIA because the remedy is entirely consistent with the parties' "special arrangement": the Republic agreed to maintain an agent for service of process at its diplomatic mission in New York, and the Plaintiffs duly served the diplomatic agent as designated by the Court's Order remedying the Republic's breach.  *See, e.g.*, *Int'l Road Fed'n*, 131 F. Supp. 2d at 251-52.  The Court's remedy provides notice as required by Rule 4 and the Constitution.  *See Hanna*, 380 U.S. at 462 n.1.  The remedy provided by the Court therefore complies with the FSIA.

## II

### THE COURT APPROPRIATELY EXERCISED ITS AUTHORITY TO REMEDY THE REPUBLIC'S BREACH OF THE SPECIAL ARRANGEMENT WHEN IT DIRECTED SERVICE UPON THE REPUBLIC'S EMBASSY IN NEW YORK

The Republic also takes issue with the manner in which the Court effected a remedy the Republic's breach of the "special arrangement."  Rather than mooting the issue by simply authorizing its counsel to accept service, the Republic challenges the Court's exercise of discretion in two ways: (1) the Republic argues that the Court's Order is inconsistent with New York contract law; and (2) the Republic argues that the Order violates the Vienna Convention. Both challenges fall short.

#### A.    The Republic's Specious Specific Performance Argument

The Republic argues that its breach of the "special arrangement" does not authorize the Court to order specific performance, citing cases where a damage remedy is available.  (MOL at 16-17.)  The Republic's *ipse dixit* that Plaintiffs can recover monetary damages for its breach vastly understates the nature of the breach, the harm caused by the breach, and the availability of specific performance to remedy the breach.  The Republic cannot shrug off its "special

arrangement" as a promise that "merely eases the collection process."[14]  (MOL at 16.)  Its

commitment to appoint an agent for service of process in New York was integral to the parties'

agreement and inextricable from the Republic's other contractual commitments, including the

Republic's sovereign immunity waiver, its commitment to New York's jurisdiction, venue, and

law, and its promise to pay interest on the bonds.  Denying Plaintiffs any facet of this bargain is

tantamount to denying them the entire bargain.  Such disregard of the parties' efforts to comply

with the FSIA would have lasting reverberations on the global bond market generally, where

billions of dollars of sovereign debt are issued on these terms.  Should the Republic be permitted

to shirk its contractual duty, there would be no guarantee that Plaintiffs could ever serve the

Republic through any other means and, even if they could, the time lost could substantially

diminish whatever recovery they might obtain.  In these circumstances, the Order was well

within the Court's equitable authority and its broad discretion to order specific performance.

In contract actions, New York courts have broad discretionary authority to protect

expectation interests, and they exercise that authority by "aim[ing] to put the nonbreaching party

in as good a position as she would have occupied had there been full performance."  *MyPlayCity,*

*Inc. v. Conduit Ltd.*, No. 10 Civ. 1615 (CM), 2013 WL 150157, at *2 (S.D.N.Y. Jan. 11, 2013).

That is precisely what the Order does here.  "In general, specific performance is appropriate

when money damages would be inadequate to protect the expectation interest of the injured party

---

[14] The case cited in the MOL for the proposition that an agent "eases the collection process" has nothing to do with the special arrangement here. *N.Y. Cmty. Bank v. Estate of Paraskevaides*, No. 18-cv-3987 (PKC), 2019 WL 3024703, at *6 (S.D.N.Y. July 11, 2019). The *Paraskevaides* court had jurisdiction over all the defendants – and, indeed, tried the case on the merits – even though the defendants breached the obligation to replace an agent to accept further service. *Id.* The only evidence of any damage caused by the breach was to complicate collection on a loan, but the Court had required full payment on the loan as part of the judgment at trial. *Id.* Here, by contrast, Plaintiffs cannot even proceed with these lawsuits absent enforcement of the breached arrangement.

and when performance will not impose a disproportionate or inequitable burden on the breaching party." *Cho v. 401-403 57th St. Realty Corp.*, 300 A.D.2d 174, 175, 752 N.Y.S.2d 55, 57 (1st Dep't 2002) (citations omitted).  Significantly, nothing in the MOL even hints at any burden resulting from the Order, let alone an inequitable burden.  The only burden has been incurred by Plaintiffs, through their efforts to serve papers in accordance with the Order.  The end result is that the Court fulfilled the parties' expectation interests—the Republic has received, and is on notice of, the Complaints and it can answer for itself in the parties' chosen forum.

The Republic's commitment to appoint an agent for service of process is "not a minor consideration"—rather, the bargained-for special arrangement is integral to its debt obligations and "incapable of being valued with reasonable certainty." *Stellar Sutton LLC v. Dushey*, 82 A.D.3d 485, 486, 918 N.Y.S.2d 418, 420 (1st Dep't 2011); *see also Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 415, 729 N.Y.S.2d 425, 429 (2001) (specific performance appropriate where "the subject matter of the particular contract is unique and has no established market value").  Even if Plaintiffs could serve the Republic through other means – and there is no guarantee that they can – the further delays incurred in attempting to do so could significantly diminish Plaintiffs' ultimate recovery from the Republic.  (*See, e.g.*, MOL at 5-7.)  Other plaintiffs already have judgments against the Republic and there is an additional risk that other plaintiffs will obtain earlier-in-time judgments if this case is further delayed.  *See, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 152 (3d Cir. 2019), *petition for cert. filed*, No. 19-1049 (U.S. Feb. 24, 2020).  The timing of any judgment may well determine the sequence of collections, thereby placing Plaintiffs at a lower position for recovery vis-à-vis other judgment creditors, a detriment that would constitute irreparable harm.

The Court properly acted to minimize such potential harm.  Specific performance is appropriate where a full award "cannot be collected by judgment and execution."  Restatement (Second) of Contracts § 360 cmt. d.  The Republic is wrong to contend that monetary relief can remedy its persistent refusal to abide by its "special arrangement."  *Cf. NML Capital*, 699 F.3d at 262 ("Insofar as Argentina argues that a party's persistent efforts to frustrate the collection of money judgments cannot suffice to establish the inadequacy of a monetary relief, the law is to the contrary. In this context, the district court properly ordered specific performance.") (citations omitted).  "Since this is not a situation in which there are no 'as matter of law' requirements one way or the other, denial of specific performance would constitute an abuse of discretion as a matter of law if there is no evidence to sustain the conclusion that requiring it would be a drastic or harsh remedy."  *Da Silva v. Musso*, 53 N.Y.2d 543, 547, 444 N.Y.S.2d 50, 52 (1981) (citations omitted).  There is nothing drastic or harsh about requiring the Republic to accept service of the Complaints in accordance with its commitments.  The Court's Order was entirely appropriate and fully within its "sound discretion."  *McFarland*, 322 F.2d at 739.

### B.      Vienna Convention Inapplicable

The Republic cites to an "inviolability" clause in Article 22(1) of the Vienna Convention to argue that the Court was forbidden to authorize service on a diplomatic mission.  (MOL at 14-16.)  This argument also fails for several reasons.  First, the Republic overstates the applicability of the treaty to the facts at issue.  Second, the Republic has waived any possible applicability of the treaty when it waived its sovereign immunity and when it expressly promised that Plaintiffs could serve the Complaints at its diplomatic mission.

First, "inviolability" under the Vienna Convention has a much more limited meaning than that ascribed to it by the Republic and, once again, the Republic's reliance on *Sudan v. Harrison* misses the mark.  The Supreme Court in that case significantly did not say that the Vienna

21

Convention required a constrained interpretation of the FSIA.  Instead, the Court chose to interpret "[im]perfect draftsmanship" in Section 1608(a)(3)'s provision for service by mail to an embassy in a way to avoid "potential international implications" under Article 22(1) of the Vienna Convention which provides that an embassy is "inviolable."  *Harrison*, 139 S. Ct. at 1060-62.  In dissent, Justice Thomas explained why the majority's concerns were misplaced: there is a difference between "inviolability" and "immunity" under the treaty.  *Id.* at 1066 (Thomas, J., dissenting) ("Given the [Vienna Convention's] consistent use of "inviolability" to protect against physical intrusions and interference, and "immunity" to protect against judicial authority, Article 22(1)'s protection of the mission premises is best understood as a protection against the former. Thus, under the [Convention], the inviolability of the embassy's premises is not implicated by receipt of service papers to any greater degree than it is by receipt of other mail.").  That is, Article 22(1) of the Vienna Convention does not demand a strained interpretation of the FSIA.

But even if the majority's view of "inviolability" were relevant here, the Vienna Convention's prohibition on "agent of the receiving state" entering an embassy surely does not apply to a process server.  *See, e.g., Napolitano v. Tishman Const. Corp.*, No. 96 CV 4402(SJ), 1998 WL 102789, at *6 (E.D.N.Y. Feb. 26, 1998) (private plaintiffs in civil suit not "agents of the receiving state").  Although some state regulations may impose certain licensing requirements on process servers, that does not mean the servers are agents of the United States.  Rule 4(c) demonstrates otherwise: "Any person who is at least 18 years old and not a party may serve a summons and complaint."  FRCP 4(c)(2).  Rather than agent of the state, the server is best viewed as an agent of the plaintiff.  *See* FRCP 4(c)(1) ("The plaintiff is responsible for

having the summons and complaint served within the time allowed by Rule 4(m) and must furnish the necessary copies to the person who makes service.").

Second, the inarguable fact is that, unlike the Republic of Sudan, the Republic here has consented to service on diplomat (*i.e.*, the Consul) and diplomatic missions (*i.e.*, the Consulate). The question is whether those consents constitute a waiver of the "inviolability" clause that would effectively authorize alternative service on an Embassy when the sovereign refuses to honor its contractual commitment to appoint an agent for the service of process. To ask the question would seem to provide an answer. Whether "inviolability" or "immunity" concerns are presented by the Vienna Convention, the issue arises only from "an attempt to assert jurisdiction over a foreign government without its consent," which obviously has not happened here. *Hellenic Lines, Ltd. v. Moore*, 345 F.2d 978, 983 n.5 (D.C. Cir. 1965) (Washington, C.J. concurring). Here there is a contract in which the Republic expressly waived its sovereign immunity, and expressly agreed that it could be served in New York upon individuals ordinarily deemed diplomatically sensitive.[15] The Court can and did enforce the Republic's agreement.

## III

## THE COURT SHOULD NOT VACATE THE CERTIFICATES OF DEFAULT

Plaintiffs do not dispute the Republic's assertion that the standard for vacating a Certificate of Default is low. Plaintiffs do disagree, however, with the Republic's contentions that its default was not willing. Plaintiffs also disagree with the Republic's contentions

---

[15] The Republic hints – but does not argue – that service on an individual whose diplomatic status is not recognized by the United Nations weakens the efficacy of the Order. (MOL at 8.) It does not develop the argument further, presumably because its logical conclusion undermines its Vienna Convention argument, concedes the Court's authority to act, and underscores the prejudice caused by the Republic's persistent breach of the special arrangement. In any event, the Republic has notice of the Complaint and there is no reason, under the above authorities, that service could not be effected on the Embassy consistent with the FSIA.

concerning the lack of prejudice that would follow from vacating the Certificates.

Willfulness, in the context of a default, "refer[s] to conduct that is more than merely negligent or careless." *S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998). A strategic decision to default does not constitute excusable neglect. *See U.S. v. Erdoss*, 440 F.2d 1221, 1223 (2d Cir. 1971). The Republic, having received the Complaints and asserted that it has valid defenses to the claims therein, has freely acknowledged that it elected not to respond. (*E.g.*, D.E. 17 in 19-cv-04796.) Such a strategic decision is the very definition of willfulness. *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 243 (2d Cir. 1994) (upholding denial of motion to vacate default judgment where bank owned by the Republic of Iraq knew about allegations in complaint following successful service by alternative means but refused to appear or answer the complaint); *see also U.S. v. DiPaolo*, 466 F. Supp. 2d 476, 482 (S.D.N.Y. 2006).

Plaintiffs will also suffer prejudice if the Certificates of Default are vacated for substantially the same reasons as warrant the award of specific performance. It has been nine months since Plaintiffs served the Republic, but the Republic's refusal to litigate on the merits has delayed what should be straightforward litigation. Until a judgment is entered, Plaintiffs are not yet judgment creditors. Further delay runs the risk of undercutting the Plaintiffs' ability to recover vis-à-vis other judgment creditors. Vacating the default rather than entering judgments given the Republic's recalcitrance would be prejudicial and inequitable.

At a minimum, the Court should only – if at all – vacate the Certificates of Default in connection with a ruling that the Republic was properly served and that these cases can proceed on their merits. To the extent the Republic contends it has valid defenses that it can present to the Court for disposition, then it should acknowledge the Court's authority to remedy all of the Republic's contractual breaches, including its "special arrangement."

24

## **CONCLUSION**

With its Motion, the Republic asks this Court to ignore the plain language of its breached commitments.  The Republic asks the Court to ignore that the Republic has: (a) irrevocably submitted itself to the jurisdiction of this Court; (b) irrevocably waived its sovereign immunity; and (c) breached the "special arrangement" it made when it sold millions of dollars of bonds to Plaintiffs.  The Court should not ignore this clear contractual language.  The Court has authority and discretion to effect a remedy of the Republic's breach.  Because the Court exercised its authority and discretion in a reasonable fashion when it issued the Order in June 2019, the Court should deny the Motion to Dismiss.  Given the prejudice resulting from the Republic's intentional refusal to abide by its commitments, there are compelling reasons to deny the Motion to Vacate as well, or at least grant it conditionally upon an acknowledgment of service.

Dated: New York, New York
April 10, 2020

DUANE MORRIS LLP

By: s/ Anthony J. Costantini
Anthony J. Costantini
David T. McTaggart
1540 Broadway
New York, N.Y. 10036-4086
Phone: (212) 692-1000
Fax: (212) 692-1020
ajcostantini@duanemorris.com
dtmctaggart@duanemorris.com

*Attorneys for Plaintiffs*